IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE HASKINS,                      :     CIVIL ACTION
                                    :     NO. 08-776-ER
          Plaintiff,                :
                                    :
          v.                        :
                                    :
CHRISTIANA CARE HEALTH              :
SERVICES,                           :
                                    :
          Defendant.                :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          April 1, 2010

## I. INTRODUCTION

        Plaintiff Diane Haskins ("Plaintiff" or "Haskins")
commenced this suit against her former employer, Christiana Care
Health Services ("Defendant" or "CCHS") alleging that she was
wrongfully terminated as a result of racial discrimination in
violation of 42 U.S.C. § 1981.  CCHS moves for summary judgment
on the grounds that Haskins has failed to establish a prima facie
case of racial discrimination or, alternatively, has failed to
demonstrate that CCHS' articulated non-discriminatory reason for
her termination is pretextual.  For the following reasons, CCHS'
motion for summary judgment will be granted.


## II. BACKGROUND

        Haskins began working for CCHS in 1988, and in July
2003 she took a position as a patient guide ("Patient Guide") in

CCHS' Public Safety Department ("Public Safety Department").
(Pl.'s SOF ¶ 1.)  Haskins interviewed for her position as a
Public Safety Guide with Sergeant Michael Diossi ("Sgt. Diossi")
and Bruce Blackburn, Chief of Security for the Public Safety
Department ("Chief Blackburn").  (Diane Haskins Dep. 41:22-42:9,
May 14, 2009.)  Sgt. Diossi was Haskins' supervisor during the
entire time that she worked in the Public Safety Department.
(Id.)

In her role as a Patient Guide, Haskins was assigned to
CCHS' maternity ward and was responsible for monitoring incoming
visitors to enforce CCHS' visitation policy, i.e., Haskins acted
as a customer service representative for visitors and patients in
the maternity ward.  (See Def.'s Mot. Summ. J. Appx. 76-77.)  All
Patient Guides, including Haskins, were subject to conduct
standards as well as an attendance and lateness policy (the
"Lateness Policy").  According to the Lateness Policy, employees
who work eight shifts bi-weekly, such as Haskins did during her
employment with CCHS, are subject to discipline if they are late
for a scheduled shift (an "Occurrence") more than four times in a
rolling 12-month period.  (Id. 115-18.)

In general, CCHS employs a formal progressive
disciplinary policy (the "Disciplinary Policy").  (Id. 119-124.)
Under this Disciplinary Policy, an employee would be issued a
"coaching" upon an initial violation.  (Id.)  Further infractions

- 2 -

would then warrant a "First Step Reminder," a "Second Step
Reminder," and then "Decision Making Leave" ("DML"). (Id.)  DML
is the final level of discipline prior to termination under the
terms of the Disciplinary Policy.  (Id.)[1]

After four months working in the Public Safety
Department Plaintiff violated the terms of the Lateness Policy
and was issued a "positive coaching" for attendance from Sgt.
Diossi on November 12, 2003.  (Id. 153.)[2]  During the period from
June 2003 to November 2003, CCHS received several third-party
complaints expressing dissatisfaction with Haskins' interaction
with visitors and patients.  (Id. 156-171.)  In November 2003,
Haskins had an informal meeting with Sgt. Diossi and Chief
Blackburn to discuss these third-party complaints, at which time
they offered Haskins assistance in dealing with the public.  (Id.
174-75.)  In light of continued complaints as to Haskins'
demeanor, she was issued a "Second Step Reminder" by Sgt. Diossi
and Chief Blackburn on November 21, 2003.  (Id. at 55, 173.)

Subsequent to Haskins' initial coaching and being given
a Second Step Reminder, she had six Occurrences under the
Lateness Policy between November 2003 and March 2004.  (Id. 126-

---

[1]     The Disciplinary Policy does provide that certain
infractions are serious enough to warrant foregoing one or more
levels prior to termination.  (Id. 125.)

[2]     A "coaching" does not constitute a formal disciplinary
measure under the Disciplinary Policy.

- 3 -

52.)  On March 9, 2004, Haskins received another "positive coaching" from Sgt. Diossi concerning her lateness infractions. (Id. 176.)  In addition, during the period of February 2004 through March 2004, CCHS received additional third-party complaints regarding Haskins' rude demeanor toward visitors and patients.  (Id. 177-78.)  Based on these additional behavioral complaints, Haskins was placed on DML on March 16, 2004.  (Id. 181.)  According to the Disciplinary Policy, a DML stays active for the employee for a period of three years, and any further infractions during that period may warrant termination of the employee.  (Id. at 119-24.)  Haskins' DML specifically stated that "[a]ny additional attendance or performance problems or violations of CCHS policies or procedures will be reviewed for termination."  (Id. 181.)

After being placed on DML, CCHS received two additional complaints regarding Haskins' unprofessional demeanor on May 29, 2004 and February 13, 2005, respectively.  (Id. 189, 191.)  Haskins received verbal coaching from Sgt. Diossi in response to both of these incidents.  Furthermore while on DML, Haskins had two additional Occurrences in violation of the Lateness Policy. (Haskins Dep. 91:6-14, 96:2-11.)  In response to these Occurrences, Haskins was placed on an Action Plan (the "First Action Plan") which set forth stringent guidelines for her attendance.  (Def.'s Mot. Summ. J. Appx. 195.)  The First Action

- 4 -

Plan clearly stated that "[a]ny future disciplines for your work performance or occurrences may result in your termination of employment at CCHS."  (Id.)

While still on DML, and after being placed on the First Action Plan, Haskins had a total of six Occurrences in violation of the Lateness Policy on January 31, 2006, February 12, 2006, April 14, 2006, May 7, 2006, July 4, 2006, and July 5, 2006. (Id. 126-152; Haskins Dep. 102-105.)  In July 2006, after these Occurrences, Haskins was placed on a second Action Plan (the "Second Action Plan") concerning compliance with the Lateness Policy.  (Id. 197.)  The Second Action Plan clearly stated that "[d]ue to the fact that you have Decision Making Leave (DML) initiated in 2004 which is still active, any infraction of the lateness policy up to January 31, 2007 will result in further disciplinary actions to include termination."  (Id.)

During her period of employment Haskins received annual employment evaluations (the "Employment Evaluations"), which Sgt. Diossi was responsible for preparing.  (Id. 59-75.)  The Employment Evaluations rated Haskins as a "key contributor" in several facets of her responsibilities, indicating that she was performing at a satisfactory to above-average level.  (Id.)  The Employment Evaluations also referenced positive feedback from patients and visitors that Haskins received.  (Id.)  The Employment Evaluations did expressly reference the third-party

complaints received by CCHS regarding Haskins' demeanor, however, Sgt. Diossi did note that Haskins had showed improvement in response to these complaints.  (See id.)  The last Employment Evaluation for Haskins was completed approximately five months prior to her termination.  (Id. 75.)

On November 5, 2006, Haskins was late to work, albeit only approximately one minute late, which violated both the DML and First and Second Action Plans.  (Haskins Dep. 106:21-107:8.) As a result, a decision was made to terminate Haskins' employment.  This decision was collectively made and approved by Sgt. Diossi, Chief Blackburn, the Director of the Public Safety Department (Jeff Benyo), CCHS Vice-President Robert Mulrooney, and CCHS Employee Relations.  (See Def.'s Mot. Summ. J. Appx. 56.)  The termination record received by Haskins stated that "[b]ased on your active DML, as well as your failure to stay within CCHS attendance standards, your employment with CCHS is being terminated effective immediately."  (Id. 198.)  Haskins filed an internal appeal of her termination and requested a Peer Review panel.  This appeal was denied unanimously by the panel. (Id. 202-03.)

On October 15, 2008, Plaintiff filed a complaint against Defendant, alleging race discrimination pursuant to 42

U.S.C. § 1981.[3]  Defendant has moved for summary judgment
pursuant to Fed. R. Civ. P. 56, which is now ripe for the Court's
review.


## III.   MOTION FOR SUMMARY JUDGMENT

   A.   <u>Standard for Summary Judgment</u>

      A court may grant summary judgment when "the pleadings,
the discovery and the disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(C).  A fact is "material" if its
existence or non-existence would affect the outcome of the suit
under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986).  An issue of fact is "genuine" when there is
sufficient evidence from which a reasonable jury could find in
favor of the non-moving party regarding the existence of that
fact. <u>Id.</u> at 248-49.  "In considering the evidence, the court
should draw all reasonable inferences against the moving party."
<u>El v. Se. Pa. Transp. Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007).
However, while the moving party bears the initial burden of
showing the absence of a genuine issue of material fact, the
nonmoving party "may not rely merely on allegations or denials in

---

[3]    Plaintiff also alleged violations of 42 U.S.C. § 1983
and the Fourteenth Amendment.  These claims were dismissed
pursuant to an Order dated January 14, 2009.

its own pleading; rather its response must-by affidavits or as
otherwise provided in [Rule 56]-set out specific facts showing a
genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

B.   The McDonnell Douglas Paradigm

Section 1981 prohibits "racial" discrimination in the
making of private and public contracts.  See 42 U.S.C. § 1981;
St. Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987).
Section 1981 claims are analyzed under the same burden-shifting
framework used in Title VII discrimination cases articulated in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).
See Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d
Cir. 1999) ( "[T]he elements of employment discrimination under
Title VII are identical to the elements of a section 1981
claim.")  Proceeding "in three stages[,]" a McDonnell Douglas
inquiry first requires a plaintiff to demonstrate a prima facie
case of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d
403, 410 (3d Cir. 1999).

To establish a prima facie case, a plaintiff must
demonstrate 1) that she is a member of a protected class; 2) that
she was qualified for the position in question; 3) that she was
discharged; and 4) that she was terminated "'under circumstances
that give rise to an inference of unlawful discrimination.'"
Waldron v. SL Indus. Inc., 56 F.3d 491, 494 (3d Cir. 1995)
(quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

253 (1981)).  A plaintiff may demonstrate a circumstantial inference of discrimination in many ways, but must produce "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . ."  Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999) (quoting O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996)) (alterations in original).  "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race . . . ."  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (quoting Pivirotto, 191 F.3d at 352).

If the plaintiff establishes this prima facie case, the burden of production shifts, and the employer must "articulate some legitimate, nondiscriminatory reason for" its actions. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802).  Should the employer express "a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must . . . show by a preponderance of the evidence that the employer's explanation is pretextual."  Id.  To demonstrate pretext, plaintiff must provide evidence that would allow a fact finder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not the motivating or

determinative cause of the employer's action."  Id. at 764.

C.   Application

There is no dispute as to the first three elements of

Plaintiff's prima facie case: (1) she is African-American (a

protected class), (2) she was qualified for the position that she

held, and (3) she suffered an adverse employment action when she

was terminated by CCHS.  The parties dispute, however, whether

Plaintiff has established the fourth prong of the prima facie

case - that she was terminated "'under circumstances that give

rise to an inference of unlawful discrimination.'"  Waldron, 56

F.3d at 494 (quoting Burdine, 450 U.S. at 253).

1.   Inference of Discrimination Prong

In order to support the inference of discrimination

necessary to establish a prima facie case, Haskins must

demonstrate either that (1) similarly situated persons who are

not members of the protected class were treated more favorably,

or (2) that the circumstances of her termination give rise to an

inference of discrimination.  See McDonnell, 411 U.S. at 802,

Jones, 198 F.3d at 410-11.  These grounds are addressed in turn.

a. Similarly Situated Employees

Haskins points to two similarly situated CCHS

employees, Denise Patterson ("Patterson") and Betty Carabello

("Carabello"), in arguing that an inference of racial

- 10 -

discrimination is present in this case.[4]  Both Patterson and

Carabello are Patient Guides in the Public Safety Department.

Patterson is white while Carabello is Hispanic.  Haskins contends

that both Patterson and Carabello were guilty of multiple

infractions of the Lateness Policy, however, neither was

disciplined as a result of these violations.  Accordingly,

Haskins' apparent theory in support of an inference of

discrimination is that non-African American employees were

treated more favorably with respect to CCHS' Lateness Policy.

Haskins' reliance on the treatment of Patterson and Carabello in

support of her prima facie case fails for two reasons.

First, Haskins has selected only two co-employees to

serve as comparators without providing any information as to the

remaining Patient Guides who could also serve as comparators.

The Third Circuit has instructed that under the McDonnell Douglas

framework, a plaintiff is not permitted to simply selectively

choose a comparator in order to show differing treatment among

protected and non-protected group members.  See Simpson v. Kay

Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir.

---

[4]      In her deposition, Haskins testified that she was
subject to racial discrimination based on the more favorable
treatment given to an additional CCHS employee, Kathleen Kelly
("Kelly").  (See Haskins Dep. 29:7-15.)  In responding to
Defendant's motion for summary judgment, Haskins eschews any
argument concerning Kelly's status as a similarly situated
employee in support of her prima facie case.  Therefore, Kelly's
status in relation to Haskins need not be addressed by the Court.
Even assuming arguendo that Haskins intended to rely on Kelly as
a similarly situated employee, Kelly does not constitute a valid
comparator for the same reasons discussed with respect to
Patterson and Carabello.

1998) (finding that allegations concerning the treatment of one younger employee were insufficient as a matter of law to infer age discrimination).  The determination of whether an employer's actions support an inference of discrimination is to be made based on the treatment of the allegedly more favored group as a whole, such that a showing of preferential treatment to one member of the non-protected class, standing alone, is generally not sufficient to create an inference of discrimination.  See id. at 645-46; see also McDonnell Douglas, 411 U.S. at 804 (employer's actions are prohibited only if based on criteria applied to members of all races); Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 90 (3d Cir. 2009) (plaintiff could not selectively "pick and choose" a comparator for purposes of computing damages under Title VII, rather plaintiff must choose similar employees against whom to compare herself).

Here, Haskins provides no information as to the composition of the remaining CCHS Patient Guides or any justification for selecting Patterson and Carabello as comparators.  Approximately 17 Patient Guides are stationed in CCHS' Public Safety Department.  (Def.'s Mot. Summ. J. 3.) Absent any information as to these remaining Patient Guides, i.e., their race and disciplinary histories, the Court cannot discern whether these comparators were simply "cherry-picked" by Haskins in order to support her inference of discrimination.

- 12 -

Therefore, Haskins has failed to demonstrate that Patterson and Carabello qualify as similarly situated employees under the McDonnell Douglas analysis.

Second, the employment characteristics of Haskins are sufficiently dissimilar from those of Patterson and Carabello, such that they cannot be branded "similarly situated" for purposes of supporting an inference of discriminatory treatment. It is true that "similarly situated" employees need not be "identically situated" in order to be valid comparators. See Bennun v. Rutgers State Univ., 941 F.2d 154, 178 (3d Cir. 1991). Courts have recognized, however, that in order for an co-employee to be an appropriate comparator she should hold a similar position, report to the same supervisor, possess a similar disciplinary record, and engage in the same type of misconduct as the plaintiff. See, e.g., Opsatnik v. Norfolk Southern Corp., 335 F. App'x. 220, 223 (3d Cir. 2009) (non-precedential opinion) ("Which factors are relevant [in discerning whether an individual is similarly situated] is determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'") (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)); Red

v. Potter, 211 F. App'x 82, 84 (3d Cir. 2006) (non-precedential opinion) (citing Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) (stating in order to show that an employee is "similarly situated," all of the relevant aspects of employment need to be nearly identical); Dempsey v. Del. Dep't of Pub. Safety, 579 F. Supp. 2d 616, 622 (D. Del. 2008) (it is appropriate for the plaintiff to show that members of the non-protected group, inter alia, had similar disciplinary records and were disciplined by the same decision-makers) (citing Maull v. Div. of State Police, Dep't of Pub. Safety, State of Del., 141 F. Supp. 2d 463, 478-83 (D. Del. 2001)); Martin v. Pachulski, Stang, Ziehl, Young & Jones, P.C., 551 F. Supp. 2d 322, 300 n.2 (D. Del. 2008) (employees who did not hold the same positions were not comparably situated); Robinson v. PFPC, Inc., No. 08-5113, 2010 WL 744191, at *5 (E.D. Pa. Mar. 4, 2010); Dawson v. Harran, No. 08-7, 2009 WL 2431343, at *6 (E.D. Pa. Aug. 6, 2009) (co-workers who did not share the same supervisor, where employed for a longer period of time, and did not hold equivalent title could not be used as comparators); Parsia v. Allied Tube & Conduit Corp., No. 07-2436, 2009 WL 750191, at *10 (E.D. Pa. Mar. 19, 2009) (finding a co-worker who had been employed for "a vastly longer time period" by defendant was not similarly situated to plaintiff).

Here, sufficient evidence exists in the record to show that the characteristics of Haskins' employment differed from Patterson and Carabello on at least three grounds. One, Patterson and Carabello worked different shifts than Haskins (8 hour shifts/5 days per week versus 10 hour shifts/4 days per week), to different attendance standards under the Lateness Policy. (See Dioss Dec. ¶ 3; Def.'s Mot. Summ. J. Appx. 115-118.) Two, neither Patterson nor Carabello possessed a similarly lengthy disciplinary record in comparison to Haskins. CCHS emphasizes that neither Patterson nor Carabello even reached a First Step Reminder under the progressive Disciplinary Policy, whereas Haskins had been placed on DML and was given two separate Action Plans concerning her serial violations of the Lateness Policy. More specifically, Haskins simply posits that Patterson and Carabello's infractions were not enforced under the Lateness Policy without citing to any evidence in the record to demonstrate that either had a comparable number of latenesses or other disciplinary infractions. This is particularly relevant in light of the fact that once Haskins was placed on DML and/or an Action Plan, she was subject to termination for a single infraction under the Disciplinary Policy. Three, Sgt. Diossi, who directly supervised Haskins throughout the relevant period, never supervised Carabello and supervised Patterson for only a brief time prior to her being transferred to the supervision of a

Lieutenant Smith in the Public Safety Department.  (Diossi Decl. ¶ 5.)  In light of these distinguishing factors, Haskins has failed to demonstrate that either Patterson or Carabello is "similarly situated" for purposes of establishing an inference of discrimination.

       b.    Circumstances Indicating Causal Nexus Between Haskins' Race and Termination.

Haskins contends that her termination based on an incident in which she was only one minute late for her shift in conjunction with her receiving positive performance reviews prior to her termination constitute circumstances which create an inference of discrimination under McDonnell Douglas.  This argument is inapposite.

"The requirement that the adverse employment action occur under circumstances giving rise to an inference of discrimination can be satisfied in several ways, and must be tailored to fit the context of the case."  Cheatom v. Burger King Corp., No. 05-251, 2006 WL 435732, at *4 (E.D. Pa. Feb. 22, 2006); see Pivirotto, 191 F.3d at 357 ("requirements of the prima facie case are flexible").  Therefore, in determining whether the circumstances relied upon by Haskins create an inference of discrimination, they must be viewed in context.

Haskins does not contest that the one-minute infraction still constituted a valid Occurrence under the Lateness Policy.  Viewed in isolation, the one-minute lateness could be construed

as a de minimis infraction.  Viewed in context, this incident formed the final link in a string of violations.  In other words, if this one-minute violation had been Haskins' only transgression rather than the proverbial "straw that broke the camel's back," then an inference of discrimination may have been justified. Cast in this light, CCHS was entitled to terminate Haskins under the Disciplinary Policy for numerous infractions including the one-minute Occurrence in question.

        Haskins also argues that she received positive feedback in certain areas of her Employment Evaluations prior to her termination.  Although courts have recognized that an employee's termination following positive performance reviews can give rise to an inference of discrimination, these cases generally involve at least one additional factor indicating that the shift from positive evaluations to termination was based on a discriminatory motive.  See, e.g., Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1422 (3d Cir. 1991) (reversing district court's grant of summary judgment in age discrimination case where plaintiff was terminated following years of positive performance feedback and refusing to accept an offer of early retirement); Underwood v. Sears, Roebuck and Co., 343 F. Supp. 2d 259, 269 (D. Del. 2004) (denying summary judgment on the ground that an inference of discrimination existed where reduction in work force involved a disproportionate reduction in female employees and plaintiff

- 17 -

presented evidence that employee evaluations used to justify terminations contained a subjective element and contradicted recent positive employee evaluations).

In this case, Haskins points to no additional evidence of racial discrimination, such as derogatory comments or actions, which could support an inference of discrimination.  Moreover, as discussed above, CCHS acted strictly within the bounds of the Disciplinary Policy in dismissing Haskins.  Therefore, these positive evaluations, without more, do not support an inference of discrimination sufficient to satisfy the fourth prong of Haskins' prima facie case.

As Haskins has failed to satisfy the inference of discrimination prong, it is appropriate to grant summary judgment in favor of CCHS.  See Fuentes, 32 F.3d at 765 (affirming summary judgment where plaintiff could not show that similarly situated persons not of his protected class were treated more favorably or that any other circumstances supporting an inference of discrimination existed); Wilson v. Blockbuster, Inc., 571 F. Supp. 2d 641, 651 (E.D. Pa. 2008), aff'd Coleman v. Blockbuster, Inc., No. 08-4056, 2009 WL 3824754, at *1 (3d Cir. Nov. 17, 2009) (granting summary judgment where plaintiff failed to demonstrate that a non-protected group member received more favorable treatment or any circumstances existed giving rise to a discriminatory inference).

2.   Haskins' Rebuttal of CCHS' Legitimate Non-Discriminatory Reasons for Termination.

Despite Haskins' failure to establish a prima facie case, for the sake of completeness, the Court will apply the McDonnell Douglas paradigm, assuming arguendo that Plaintiff has demonstrated circumstances giving rise to an inference of discrimination.

As to the second step of the McDonnell Douglas protocol, CCHS has articulated a legitimate, non-discriminatory reason for its decision to terminate Haskins - her repeated violations of the Lateness Policy.[5]  Plaintiff concedes that she serially violated the Lateness Policy and that these infractions were sufficient to justify her firing under the terms of the Disciplinary Policy.  Therefore, CCHS has satisfied its burden of advancing a legitimate, non-discriminatory reason for Haskins' termination.

Having found that CCHS has proffered a legitimate, non-discriminatory reason, the burden-shifting mechanism under McDonnell Douglas requires that Haskins demonstrate that this reason is merely pretextual.  Haskins contends that this

---

[5]    CCHS also relies on the third-party complaints it received concerning Haskins' demeanor as a non-discriminatory reason warranting her termination.  In light of the fact that Haskins' violations of the Lateness Policy independently justify the decision to terminate Haskins' employment, it is unnecessary to address this interrelated ground in order to resolve CCHS' summary judgment motion.

proffered reason is pretextual on two grounds: (1) the Lateness Policy was enforced arbitrarily as between African American and non-African American employees; and (2) she received laudatory Employment Evaluations prior to her termination.

As to the first ground, Haskins has failed to demonstrate that the Lateness Policy was enforced in an unfair manner with respect to African American employees.  As explained in detail above, in light of Haskins' placement on DML, any violation of the Lateness Policy between March 2004 and March 2007 could have been grounds for her dismissal.  Despite the fact that Sgt. Diossi could have exercised his authority to terminate Haskins based on her undisputed violations of the Lateness Policy throughout this period, he elected instead to construct the First and Second Action Plans to allow Haskins an opportunity to correct her serial infractions.[6]  Similarly, the fact that Sgt. Diossi was responsible for hiring Haskins and provided her the opportunity to avoid termination through the implementation of the First and Second Action Plans belies Haskins' argument that

---

[6]    In her response to summary judgment, Haskins argues that Sgt. Diossi is not the discriminatory actor, but rather that the discriminatory action was "an act of the Public Safety Department and CCHS."  (Pl.'s Resp. Summ. J. 20.)  It is clear from the record before the Court, however, that Sgt. Diossi was directly responsible for disciplining Haskins with respect to both her Occurrences under the Lateness Policy and the third-party complaints concerning her demeanor.  Therefore, Haskins' attempt to allocate liability to individuals other than Sgt. Diossi for discriminatory acts under § 1981 is inapposite.

the Lateness Policy was applied with discriminatory animus.

As to the second ground, Haskins contends that the positive feedback she received regarding her performance in her Employment Evaluations undermines CCHS' proffered non-discriminatory reason for her termination.  Again, as discussed above, the fact that Haskins received positive evaluations prior to her termination, standing alone, is not sufficient to support an inference of pretext.  See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992) (rejecting pretext argument where plaintiff received complimentary marks concerning several areas of employment but was deemed deficient in one of the most critical facets of her position); Turner v. Schering-Plough Corp., 901 F.2d 335, 343-44 (3d Cir. 1990) (observing that close proximity between positive evaluations and terminations will not necessarily raise an inference of pretext); Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1215 (3d Cir. 1988)(noting that awards, commendations, and promotions do not suggest that countervailing weaknesses do not exist or would not be important in future evaluations).  Cf. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995) (finding that summary judgment was inappropriate where plaintiff had documented deficiencies concerning several of his job responsibilities but performed well in the most critical area of his position).  Here, it is undisputed that Haskins was a serial violator of the

Lateness Policy and that the decision to terminate her based on her last Occurrence in November 2006 was consistent with the terms of the Disciplinary Policy as understood by Haskins.  As explained above, the fact that Haskins received positive feedback with respect to certain aspects of her employment did not exempt her from complying with the Lateness Policy.

Finally, whether it was appropriate from a personnel point of view for CCHS to terminate Haskins based on her violation of the Lateness Policy is not for the Court to decide, rather the Court is limited to determining whether such a decision was racially motivated.  "To discredit the employer's proffered [non-discriminatory] reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765.

For these reasons, Haskins has failed to show by a preponderance of the evidence that Defendant's legitimate, non-discriminatory reasons for terminating her employment were pretextual.  See id. at 763.  Thus, CCHS is entitled to summary judgment with respect to Haskins' § 1981 claim.


**IV. CONCLUSION**

In light of Plaintiff's inability to meet her burden of

- 22 -

production under the <u>McDonnell Douglas</u> framework, Defendant's
motion for summary judgment will be granted.  An appropriate
order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE HASKINS, | : | CIVIL ACTION |
| | : | NO. 08-776-ER |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHRISTIANA CARE HEALTH | : | |
| SERVICES, | : | |
| | : | |
| Defendant. | : | |

## O R D E R

**AND NOW**, this **1st** day of **April 2010,** for the reasons
stated in the accompanying Memorandum, it is hereby **ORDERED** that
Defendant's motion for summary judgment (doc. no. 35) is **GRANTED.**

**AND IT IS SO ORDERED.**

S/Eduardo C. Robreno

**EDUARDO C. ROBRENO, J.**